1  Jack Silver, Esquire SBN 160575
   Law Office of Jack Silver
2  Kimberly Burr, Esquire SBN 193805
   Jerry Bernhaut, Esquire SBN 206264
3  Post Office Box 5469
   Santa Rosa, California 95402-5469
4  Telephone: (707) 528-8175
   Facsimile: (707) 528-8675
5  Email: lhm28843@sbcglobal.net

6  Attorneys for PLAINTIFFS

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11 COHO    SALMON    (Onchorynchus        CASE NO.:  3:10-CV-00741 JL
   kisutch), NORTHERN CALIFORNIA
12 RIVER    WATCH,   a   non-profit       **STIPULATION RE FILING THIRD**
   Corporation  and  COAST  ACTION        **AMENDED COMPLAINT**
13 GROUP,                                  [~~PROPOSED~~] **ORDER**

14            Plaintiffs,

15 v.

16 CLINTON FOLGER doing business as
   GREEN PASTURES VALLEY, LLC
17 and DOES 1 - 20, Inclusive,

18            Defendant.
   _____/

19        IT IS HEREBY STIPULATED and agreed to by and between the parties to this action,

20 that Plaintiffs NORTHERN CALIFORNIA RIVER WATCH and COAST ACTION GROUP

21 shall be allowed to file the Third Amended Complaint for Declaratory and Injunctive Relief,

22 Civil Penalties and Remediation, a copy of which is attached hereto as Exhibit "A".  By

23 stipulating to the filing of the Third Amended Complaint, responding Defendants CLINTON

24 FOLGER, RUTH STADNIK, and NICK BRODRICK, Individually and in their capacities as

25 members of GREEN PASTURES VALLEY, LLC and GREEN PASTURES VALLEY, LLC

26

27                                            1

28

1  are not approving or admitting the allegations or contents of the Third Amended Complaint, or

2  waiving their defenses thereto.

3       IT IS FURTHER STIPULATED and agreed to by and between the parties to this action,

4  that said responding Defendants shall have thirty (30) days from the date of service of the Third

5  Amended Complaint within which to plead in response to the Third Amended Complaint.

6

7  DATED: Feb. 25, 2011         ANDRIAN & GALLENSON

8
                           By:_____/s/ *Stephen M. Gallenson*_____
9
                              STEPHEN M. GALLENSON
                              Attorneys for Defendants
10
                              CLINTON FOLGER, RUTH STADNIK,
                              NICK BRODRICK and GREEN PASTURES
11
                              VALLEY, LLC

12

13       In addition to stipulating to the above, I, Kimberly Burr attest that concurrence in the

14  filing of this Stipulation has been obtained from the other signatory to this document.

15

16  DATED: Feb. 25, 2011        _____/s/ *Kimberly Burr*_____
                            KIMBERLY BURR
17
                            Attorney for Plaintiffs
                            NORTHERN CALIFORNIA RIVER WATCH
18
                            and COAST ACTION GROUP

19

20                        ~~[PROPOSED]~~ ORDER

21

22       PURSUANT TO STIPULATION, **IT IS SO ORDERED**.

23  Dated:    March 1, 2011                    _____

24                                JAMES LARSON
                              UNITED STATES MAGISTRATE JUDGE

25

26

27                        2

28  3:10-cv-00741 JL
    Stipulation Re Filing Third Amended Complaint [Proposed] Order

# EXHIBIT   A

1   Jack Silver, Esquire SBN# 160575
    Law Office of Jack Silver
2   Kimberly Burr, Esquire SBN #193805
    Jerry Bernhaut, Esquire SBN # 206264
3   Post Office Box 5469
    Santa Rosa, California 95402-5469
4   Telephone: (707) 528-8175
    Facsimile: (707) 528-8675
5   Email: lhm28843@sbcglobal.net

6   Attorney for Plaintiffs
    NORTHERN CALIFORNIA RIVER WATCH
7   a non-profit Corporation and COAST ACTION GROUP

8

9                     UNITED STATES DISTRICT COURT

10               NORTHERN  DISTRICT OF CALIFORNIA

11

12  NORTHERN   CALIFORNIA   RIVER          CASE NO: 3:10-cv-00741 JL
    WATCH, a non-profit Corporation and
13  COAST ACTION GROUP,                    **THIRD AMENDED COMPLAINT
                                           FOR DECLARATORY AND
14              Plaintiffs,                INJUNCTIVE RELIEF, CIVIL
    v.                                     PENALTIES AND REMEDIATION
15                                         [Endangered Species Act  - 16 U.S.C. §
    CLINTON FOLGER, RUTH STADNIK,          1531 et seq.]**
16  and NICK BRODRICK, Individually and in
    their capacities as members of GREEN
17  PASTURES  VALLEY,  LLC;  GREEN
    PASTURES VALLEY, LLC; DOES 1 - 20,
18  Inclusive,
    _____/
19

20          NOW COME Plaintiffs, NORTHERN CALIFORNIA RIVER WATCH and COAST

21  ACTION GROUP, (hereafter, collectively "PLAINTIFFS") by and through their attorneys, and

22  for their Third Amended Complaint against Defendants CLINTON FOLGER, RUTH STADNIK,

23  and NICK BRODRICK, Individually and in their capacities as members of GREEN PASTURES

24  VALLEY, LLC; GREEN PASTURES VALLEY, LLC; DOES 1 - 20, Inclusive, (hereafter

25  collectively, "DEFENDANTS"), state as follows:

26

27                                          1

28
    _____
    3:10-CV-00741 JL
    Third Amended Complaint for Injunctive Relief, Civil Penalties and Remediation

## INTRODUCTION

1.      This is a civil action brought by PLAINTIFFS under the federal Endangered Species Act (hereafter, "ESA"), 16 U.S.C. § 1531 et seq., to prevent DEFENDANTS from ongoing violations of the ESA, violations of regulations pertaining to any threatened species of fish listed pursuant to ESA § 9, and knowing violations of California laws designed to protect these species. Said violations are detailed in the Notices of Violations and Intent to File Suit attached hereto as EXHIBITS A and B and fully incorporated into this Third Amended Complaint.   PLAINTIFFS contend DEFENDANTS are violating Section 9 of the ESA, 16 U.S.C. § 1538, by conducting activities that de-water, pollute, and degrade critical habitat of protected salmon species, and harm protected Coho Salmon, Chinook Salmon and Steelhead Trout.

2.      PLAINTIFFS seek declaratory relief, injunctive relief to prohibit future violations and any other relief for DEFENDANTS' violations of the ESA allowed under law.

## JURISDICTIONAL ALLEGATIONS

3.      Subject matter jurisdiction is conferred upon this Court by  ESA § 11(g)(1)(A), 16 U.S.C. §   1540(g)(1)(A), which states in part,

> "any person may commence a civil suit on his own behalf . . . (A) to enjoin any
> person, including the United States and any other governmental instrumentality
> or agency (to the extent permitted by the eleventh amendment to the
> Constitution), who is alleged to be in violation of any provision of this Act or
> regulation issued under the authority thereof. . ."

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation or to order the Secretary to perform such act or duty, as the case may be.   Under the ESA "person"  means, inter alia, an individual, corporation, partnership, trust, association, or any other private entity. ESA § 3, 16 U.S.C. § 1532.

4.     On or about December 14, 2009, PLAINTIFFS sent Notice of Violations of the ESA, and of PLAINTIFFS' intent to file suit to Defendant CLINTON FOLGER doing business as GREEN PASTURES VALLEY, LLC, and the United States Secretary of the Commerce as required by the ESA.  A true and correct copy of the Notice is attached hereto as EXHIBIT A and fully incorporated into this Third Amended Complaint.

5.     On or about November 26, 2010, PLAINTIFFS sent Notice of Violations of the ESA and of PLAINTIFFS' intent to file suit to Defendants, CLINTON FOLGER, RUTH STADNIK, NICK BRODRICK, GREEN PASTURES VALLEY, LLC and the United States Secretary of the Commerce as required by the ESA.  A true and correct copy of the Notice is attached hereto as EXHIBIT B and fully incorporated into this Third Amended Complaint.

6.     The United States is not currently prosecuting any criminal action to redress DEFENDANTS' violations as alleged in this Third Amended Complaint, nor has the Secretary of Commerce acted to impose a penalty pursuant 16 U.S.C. § 1540(a).  Therefore this action may be commenced in accord with ESA § 11(g)(2)(A)(iii)(ii) and (iii); 16 U.S.C. § 1540 (g)(2)(A)(ii) and (iii).

7.     This Court has supplemental jurisdiction over all State based causes of action in this Third Amended Complaint pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy as the Federal causes of action.

## INTRADISTRICT ASSIGNMENT

8.      The basis for assignment of this case to the Northern District of California, pursuant to 16 U.S.C. § 1540(g)(3)(A), is that the violations of ESA complained of are located within this District; and, pursuant to 28 U.S.C. § 1391(b), DEFENDANTS reside in and/or conduct business within this District.

3

## PARTIES TO THE ACTION

9.     Plaintiff Northern California River Watch is a 501(c)(3) non-profit, public benefit corporation duly organized under the laws of the State of California, with headquarters located at 500 North Main Street, Suite 110, P.O. Box 217, Sebastopol, CA 95472.  Northern California River Watch is dedicated to protecting, enhancing and helping to restore the waters of Northern California including its drinking water sources, groundwater, rivers, creeks and tributaries.

10.     Plaintiff Coast Action Group is an organization dedicated to the protection of fishery and water quality resources on the north coast of California, located at P.O. Box 215, Point Arena, CA 95468.  Coast Action Group has a history of actions supporting the protection of fish, forest, and water quality resources dating back to 1990.  Coast Action Group exists in order to protect fish and wildlife through state and federal water laws.

11.     Members of Northern California River Watch and Coast Action Group rely on DEFENDANTS to comply fully with the Section 9 "TAKE" prohibitions of the ESA, which ensures that citizens do not contribute to harm or take of species listed as endangered or threatened with extinction such as coho salmon *(Oncorhynchus Kisutch)* listed as endangered and facing extinction in all or a significant portion of their range; chinook salmon *(Oncorhynchus tshawytscha),* and steelhead trout *(Oncorhynchus mykiss),* listed as threatened of becoming endangered in the foreseeable future.  Coho Salmon, Chinook Salmon and Steelhead Trout collectively are hereafter designated and referred to in this Complaint as "COHO".   Said members derive scientific, recreational, conservation, spiritual, and aesthetic benefits from the preservation and protection of threatened and endangered species under the ESA, including COHO.  Said members have spent, and plan to further spend, time in the habitat of COHO hoping to observe these species.  The interests of Northern California River Watch, Coast Action Group and their members are adversely affected by DEFENDANTS' actions as set forth in this Third

Amended Complaint. They have been, are being, and unless the requested relief is granted, will continue to be adversely affected and injured by DEFENDANTS' failure to comply with the ESA.

12. PLAINTIFFS are informed and believe, and on said information and belief allege that Defendant GREEN PASTURES VALLEY, LLC is a Limited Liability Company, registered with the State of California as such, with a principal place of business, a family-owned vineyard, located at 1470 Felta Road, Healdsburg, CA 95448. PLAINTIFFS are informed and believe, and on said information and belief allege that Defendants CLINTON FOLGER, RUTH STADNICK and NICK BRODERICK are individuals residing in the County of Sonoma; that said defendants form the membership of GREEN VALLEY PASTURES, LLC; and, that said defendants have an ownership interest in the vineyard property located at at 1470 Felta Road, Healdsburg, CA 95448.

13. PLAINTIFFS are informed and believe, and on said information and belief allege, that Defendants DOES 1 - 20, Inclusive, respectively, are persons, partnerships, corporations or entities, who are, or were, responsible for, or in some way contributed to, the violations which are the subject of this Third Amended Complaint. The names, identities, capacities, or functions of Defendants DOES 1 - 20, Inclusive, are presently unknown to PLAINTIFFS. PLAINTIFFS shall seek leave of court to further amend this Third Amended Complaint to insert the true names of said DOES Defendants when the same have been ascertained.

## STATUTORY BACKGROUND

14. The ESA is designed to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Principal among the ESA's system of species protection is the Section 9 prohibition rendering it illegal for any "person" to "take" any species listed as endangered. 16 U.S.C. § 1538(a)(1)(B). This Section 9 prohibition against taking applies equally to species listed as threatened. 50 C.F.R. § 17.31. "Take is defined in the broadest possible manner to include every conceivable way in

5

1  which a person can 'take' or attempt to 'take' any fish or wildlife." *Defenders of Wildlife v.*

2  *Administrator, EPA*, 882 F.2d 1294, 1300 (8 Cir. 1989). The term "take" is defined as "to harass,

3  harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such

4  conduct." 16 U.S.C. § 1532(19). Harm includes "significant habitat modification or degradation

5  where it actually kills or injures wildlife by significantly impairing essential behavioral patterns,

6  including breeding, feeding or sheltering."

7       15.    To cause or contribute to the de-watering of critical habitat of listed fish species,

8  or to otherwise degrade such critical habitat is to "take" that species regardless of whether the

9  actions result in actual injury or death.   Modification of critical habitat such as the de-watering

10 of watercourses falls within the ESA's "take" definition's prohibition on harm and harassment.

11 De-watering streams also traps fish in lethally hot, crowded pools where they perish. De-watering

12 also traps fish in near shore gravels where they flounder for oxygen and die. "Trapping" which

13 results in the death of the listed animal, violates the ESA's "take" prohibition against "killing"

14 listed animals. "Take" includes direct as well as indirect harm and need not be purposeful. See

15 *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 (1995).

16 A take may even be the result of an accident. See *National Wildlife Federation v. Burlington*

17 *Northern Railroad*, 23 F.3d 1508, 1512 (9 Cir. 1994).

18

19      16.    The duty to avoid take of threatened and endangered species lies squarely with

20 DEFENDANTS. In addition to their duties under federal law, DEFENDANTS have a duty under

21 California Fish and Game Code § 2050 et seq. to avoid contributing to TAKE.  TAKE in the

22 absence of proof that the TAKE or harm is incidental to a permitted activity such as scientific,

23 educational, or conservation, is prohibited  (California Fish & Game Code § 2080.1 et seq.).

24 DEFENDANTS' use of water is limited by what is reasonable, that which is not wasteful or

25 excessive (California Constitution Article X, Section 2), or that which does not harm critical

26 habitat of listed species, or that does not directly or indirectly TAKE listed species.

27

28

6

17.     Article X, Section 2 of the California Constitution prohibits the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Furthermore, under California Water Code § 100, the right to water is limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water.

## STATEMENT OF FACTS

18.     DEFENDANTS control significant land through which Felta Creek, a tributary of Dry Creek, thence the Russian River, located in Healdsburg, Sonoma County, California, flows. DEFENDANTS control the amount of water diverted stored, pumped or otherwise used out of Felta Creek and from under flows of Felta Creek.

19.     DEFENDANTS use of Felta Creek is mandated to be limited by what is reasonable, that which is not wasteful or excessive, that which does not degrade beneficial uses of the Creek, that which does not harm critical habitat of listed species of fish, or that which does not directly or indirectly "TAKE" listed species.

20.     The Central Coast of California, includes the Russian and Gualala River basins, Mark West Creek, Green Valley Creek, the Eel River, the Garcia River, and the Navarro River, among others. COHO have historically inhabited the freshwater coastal creeks of this region in great numbers at different times during their lifecycle. These anadromous fish species spend their early life in the freshwater environment, migrate to the sea, then return at their reproductive stage to the region's freshwater coastal streams and rivers. They require healthy coastal streams and rivers to survive. According to the National Marine Fisheries Service, due to the extremely precarious status of these important fish species, all of the critical habitat is needed for their recovery. Until recently, COHO were abundant in this region; and for eons provided food for

7

humans, wildlife, and even plants.  The biological importance of COHO to the overall functioning of a healthy ecosystem in this region and beyond, cannot be overstated.

21.    The streams of the Central California Coast have historically provided essential breeding and rearing habitat for COHO.  The watercourses used to be characterized by cold, clean, and deep pools of water  necessary for rearing during the long, hot summer months and plentiful flows during the spring when the young hatch and make their way to near shore gravels for protection.  Although known to survive incredible challenges including many miles of strong currents, predators, and waterfalls in their effort to return to their place of birth and complete the age old cycle of reproduction, rapid draw downs of the waters in stream systems, even for a short time  – de-watering events, are lethal to these otherwise resilient fish.

## GENERAL ALLEGATIONS

22.    PLAINTIFFS allege activities by DEFENDANTS including, clearing, grading, ripping, and land planing of vegetated areas, grading for unspecified water storage activities, vineyard development in proximity to creeks and upslope of critical habitat, well and spring development in areas that adversely impact stream flows, and excessive, wasteful, or unreasonable pumping of surface or near stream ground water, has damaged and continues to damage critical habitat, and has caused the actual direct and indirect TAKE of COHO.

23.    PLAINTIFFS allege DEFENDANTS de-watered critical habitat in 2008 and despite knowledge of the impacts caused by this activity, proceeded to engage in the same activities in 2009 that again resulted in TAKE of rare specimens, upon which survival of the species depends, of COHO.   Small COHO known as fry were stranded when stream flows receded in a dramatic fashion in response to pumping.  The loss of hundreds of individuals of the next generation of these rare COHO, especially given the very short life cycle of COHO, the increasingly hostile environment in which they are expected to survive, and their already critically low numbers, is likely a devastating if not lethal, set back to their recovery.  The number of protected fish which

8

have actually been taken as a result of the above-described harmful activities is likely much higher than the hundreds of fish the small staff of the wildlife agencies are able to fully document.

24.     PLAINTIFFS allege DEFENDANTS are currently, and have in the past, been aware of the threats this method of water use posed to protected species.

25.     COHO numbers have declined to a point that they now face extinction.  Coho salmon live for approximately three years.  They spawn once and die in freshwater creeks while guarding their eggs and nests (redds).  Water-covered clean gravels are needed for successful egg incubation and for the young fish while they are learning to become proficient swimmers.  De-watering of creeks for even one season or a few minutes has a devastating impact on the numbers of Coho salmon that make it to the sea to mature and become strong enough to ascend the coastal watersheds to spawn and reproduce the species.  Steelhead trout and Chinook salmon have very similar life patterns.  Steelhead trout may spawn more than once but their numbers have also plummeted.

26.     PLAINTIFFS allege that due to DEFENDANTS' actions, stream flows, water temperature, and water quality are significantly degraded.  The listed salmon species once supported a vital fishing industry, grizzly bears, native cultures, and the masses of immigrants who flocked to California because of its magnificent bounty.  Today, there remains only a fragile population of COHO trying to survive in coastal California streams, and Central Coast COHO will become extinct if the violations of DEFENDANTS are not addressed.

## FIRST CLAIM FOR RELIEF

### (ESA § 9, 16 U.S.C. § 1538)

PLAINTIFFS incorporate the allegations set forth in Paragraphs 1 through 26 above and EXHIBITS A and B as though fully set forth herein, and allege as follows:

9

27.     DEFENDANTS have violated ESA § 9 and its implementing regulations by causing a direct and/or indirect TAKE of protected species by knowingly de-watering and degrading their critical habitat, consenting to excessive, unreasonable, wasteful use of the State's waters, or failing to enforce regulations prohibiting the diversion of water without the required permit(s). 16 U.S.C. § 1538; 50 C.F.R. § 17.31.

28.     PLAINTIFFS allege DEFENDANTS' violations as set forth in this Third Amended Complaint are ongoing and will continue after the filing of this Third Amended Complaint. PLAINTIFFS allege herein all violations which may have occurred or will occur prior to trial, but for which data may not have been available to PLAINTIFFS prior to the filing of this Third Amended Complaint.   PLAINTIFFS will amend the pleadings as necessary to address further violations of the ESA by DEFENDANTS which may occur after the filing of this Third Amended Complaint.

29.     PLAINTIFFS are informed and believe, and on such information and belief allege, that without the imposition of appropriate equitable relief, DEFENDANTS will continue to violate the ESA with respect to endangered species on Felta Creek.  PLAINTIFFS are further informed and believe, and on such information and belief allege, that the relief requested in this Third Amended Complaint will redress the injury to PLAINTIFFS including COHO, prevent future injury and protect the interests of PLAINTIFFS whose interests are, or may be, adversely affected by DEFENDANTS' violations as set forth in this Third Amended Complaint.

## IX.   SECOND CLAIM FOR RELIEF

### (ESA § 10, 16 U.S.C. § 1539)

PLAINTIFFS incorporate the allegations set forth in Paragraphs 1 through 29 above and EXHIBITS A and B as though fully set forth herein and allege as follows:

30.     DEFENDANTS have violated ESA § 10 by causing a direct and indirect TAKE of protected species without first obtaining a permit in accordance with all of the substantive and procedural requirements of Section 10 of the ESA.  (16 U.S.C. § 1539(a)(1)(A)).

31.     PLAINTIFFS allege the violations of DEFENDANTS as set forth above are ongoing and will continue after the filing of this Third Amended Complaint.  PLAINTIFFS allege herein all violations which may have occurred or will occur prior to trial, but for which data may not have been available to PLAINTIFFS prior to the filing of this Third Amended Complaint. PLAINTIFFS will amend the pleadings as necessary to address further violations of the ESA which may occur after the  filing of this Third Amended Complaint.

32.     PLAINTIFFS are informed and believe, and on such information and belief allege, that without the imposition of appropriate equitable relief,  DEFENDANTS will continue to violate the ESA with respect to endangered species on Felta Creek.  PLAINTIFFS are further informed and believe, and on such information and belief allege, that the relief requested in this Third Amended Complaint will redress the injury to PLAINTIFFS including COHO, prevent future injury and protect the interests of PLAINTIFFS whose interests are, or may be, adversely affected by the violations as set forth in this Third Amended Complaint.

## X.  PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS pray this Court grant the following relief:

1.     Declare DEFENDANTS to have violated and to be in violation of ESA 9 by conducting activities that de-water, pollute, and degrade critical habitat of protected salmon species thereby causing an illegal "TAKE";

2.     Declare DEFENDANTS to have violated and to be in violation of ESA 10 by "TAKING" protected salmon species without a permit;

3.     Issue an order for remediation for DEFENDANTS for the harm to listed species and their habitat caused by the activities of DEFENDANTS as alleged herein;

11

4.      Issue an injunctive order enjoining DEFENDANTS from continuing to divert (pump, dam or otherwise use) water from Felta Creek during the frost season (between March and May) of each year;

5.      Issue an injunctive order requiring DEFENDANTS to monitor and report groundwater use (date, time, and duration of use) during the frost season to PLAINTIFFS and to National Marine Fisheries Service (NOAA Fisheries) on a weekly basis;

6.      Issue an injunctive order requiring that DEFENDANTS consult with NOAA Fisheries regarding the removal of the concrete device (weir) used for damming Felta Creek;

7.      Issue an injunctive order requiring that DEFENDANTS remove all pumps and pump-related pipes from within the creek zone (1000 feet of Felta Creek);

8.      Issue an injunctive order requiring DEFENDANTS to fully cooperate with resource agencies with responsibility over wildlife including fish;

9.      Issue an injunctive order requiring DEFENDANTS to install and properly maintain automatic stream flow gauges which take and record depth, air temperature, and water temperature readings no less than once every 30 minutes; one gauge to be located at the upstream property line and a second at the downstream property line. Maintenance shall take place on a weekly basis during the frost season and monthly thereafter for a minimum of three years;

10.     Issue an injunctive order requiring DEFENDANTS to allow PLAINTIFFS access DEFENDANTS' vineyard property in Healdsburg, California with one-half hour advanced notice during the frost season to observe and investigate water use of the stream and vineyards;

11.     Order DEFENDANTS to pay PLAINTIFFS' reasonable attorneys' fees and costs (including expert witness fees), as provided by 16 U.S.C. § 1540 (g)(3)(A)(4) and applicable California law; and,

12

1    12.    Grant such other and further relief as may be just and proper.

3    DATED: February 25, 2011                    _/s/ Kimberly Burr_____
                                                 KIMBERLY  BURR
4                                                Attorney for Plaintiffs

13

# EXHIBIT A

# Law Office of Jack Silver



P.O. Box 5469      Santa Rosa, California 95402
Phone  707-528-8175      Fax  707-528-8675
lhm28843@sbcglobal.net

December 14,  2009

*Via Certified Mail -  Return Receipt Requested*

Clinton Folger, Registered Agent
Green Valley Pastures, LLC
1470 Felta Road
Healdsburg, CA 95448

Gary Locke -Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

## NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE ENDANGERED SPECIES ACT

Dear Green Valley Pastures, LLC and Secretary Locke:

## NOTICE

The Endangered Species Act ("ESA") §11(g), 16 U.S.C. § 1540 (g), requires that sixty (60) days prior to the initiation of a civil action under the ESA, an entity must give notice of its intent to sue to the alleged violator and the Secretary of Interior or Commerce.

I am writing on behalf of Northern California River Watch and Coast Action Group, collectively referred to hereafter as "NOTICING PARTIES", to notify Green Valley Pastures, LLC, referred to hereafter as "VIOLATOR", of alleged violations of ESA § 9, 16 U.S.C. § 1538 with respect to harm and unauthorized TAKE of federally protected salmonid species in Felta Creek, the activities identified in this **Notice**.

After expiration of the 60-day notice period, NOTICING PARTIES intend to file suit in federal court against alleged VIOLATOR to enjoin it from alleged violations of the ESA and/or regulations issued under the authority of the ESA.  If prior to expiration of the 60-day notice period VIOLATOR is legally enjoined from further violations of the ESA, VIOLATOR will not be named in the federal complaint.

NOTICING PARTIES also give notice to the Secretaries of Commerce and of the Interior that after the expiration of the 60-day hold period, they will file suit in federal court to enforce the ESA, unless a Secretary has commenced an action to impose a penalty pursuant to 16 U.S.C. § 1540(a); or, if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress the violations of the ESA alleged in this **Notice**.

## STATUTORY FRAMEWORK

Under ESA § 9, 16 U.S.C. § 1538(a)(1)(B), it is unlawful for any person to TAKE an endangered species. Under ESA § 4(19), 16 U.S.C. § 1532(19), the term "TAKE" includes to harass, harm, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct. TAKE includes direct as well as indirect harm and need not be purposeful. See *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. § 687, 704 (1995). In fact, a TAKE may even be the result of an accident. See *National Wildlife Federation v. Burlington Northern Railroad*, 23 F.3d 1508, 1512 (9th Cir. 1994). TAKE includes habitat modification that actually kills or injures an endangered species.

ESA § 9 is a strict liability statute, meaning that the illegal TAKING need not be intentional. Cumulative acts resulting in a TAKE are also actionable. Therefore, if water diversion in a habitat is caused by several entities rather than one, all entities may be prosecuted even if the act of one was insufficient to cause a TAKE. Attempting to cause almost any level of injury to an endangered species is also prohibited by law. A TAKE is defined in the ESA in the broadest possible manner to include every conceivable way in which a person or entity can TAKE or attempt to TAKE any fish or wildlife. *Defenders of Wildlife v. Administrator, EPA*, 882 F.2d 1294, 1300 (8th Cir. 1989). The ESA § 9 prohibition on TAKE applies equally to threatened species.

The ESA not only prohibits the acts of those parties that directly exact the TAKING, but also bans acts by a third party which bring about the acts exacting a TAKE. For instance, a governmental, third party entity pursuant to whose authority an actor directly exacts a TAKING may be deemed to have violated the ESA. *Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997) See also *Loggerhead Turtle v. County Council of Volusia Co.*, 148 F.3d 1231 (11th Cir. 1998); *Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir. 1991).

The ESA has a broad citizen suit provision allowing any entity to commence a civil suit on its own behalf to enjoin any entity that is alleged to be in violation of any provision of the ESA or regulation issued under the authority thereof. A plaintiff can seek to enjoin both present activities which constitute an ongoing TAKE and future activities reasonably likely to result in a TAKE. See *Murrelet v. Pacific Lumber Co.*, 83 F.3d 1060, 1066 (9th Cir. 1996).

## FACTUAL BACKGROUND

De-watering of rivers and streams is occurring in Sonoma and Mendocino Counties and has been linked to excessive and unreasonable diversions, over allocation of water resources, illegal diversions and illegal storage by agricultural interests. For example, in 1997, the State Water Resources Control Board ("SWRCB") staff released a report identifying vineyard practices that

adversely impact listed species of fish struggling to survive in the Russian River Basin and its tributaries. The report found that frost protection activities harmed listed species of fish including Coho, Chinook, and Steelhead. (As used herein, the term "listed species" will refer to Coho, Chinook, and/or Steelhead unless otherwise designated or described). Although this has been known since at least 1972 when the courts found that frost protection activities in the Napa River Basin were harmful to listed fish species, such frost protection activities in Sonoma and Mendocino Counties continue to occur and have increased over the years.

In 2000, SWRCB staff referred to its 1997 report emphasizing that under certain conditions, adequate water is available for appropriation in the winter, but no water is available in the spring, summer or autumn without the risk of harming fishery resources. (Staff Report SWRCB 7/2000). The Gualala River watershed is experiencing large conversions of the forests to vineyards and associated de-watering of that important fish habitat. Hundreds if not thousands of acres of vineyards have recently been planted by a relatively few large landholders above the Gualala River. The Wheatfield Fork of the Gualala River now has documented dry stretches that have historically supported Steelhead, rearing pools, and flows sufficient to keep baby salmon and Steelhead, also known as fry, secure until such time as they are proficient swimmers. Removal of extensive amounts of vegetation and the subsequent intensive grading, grubbing, ripping, and planting of vineyards on the slopes above the Wheatfield Fork and its tributaries has changed the hydrology of the area. Such intensive agricultural activity requires substantial amounts of water and adversely impacts recharge and erosion rates. It is alleged that the water needs of new vineyards are adversely affecting in-stream flows in the Wheatfield Fork in an unreasonable manner, resulting in complete loss of flows in several areas of the stream at certain times of the year.

The Wheatfield Fork used to provide flows adequate to support juveniles of listed species until the time they made their way downstream to the sea to mature before their return migration to spawn. Streams that supported protected Steelhead and Coho only a few years ago, are now turning into deserts. The Russian River, including Felta Creek and the Wheatfield Fork of the Gualala River, are being especially hard hit. The habitat of listed species is being decimated. Where there were pools last year and the year before, there is dried vegetation, hot exposed gravels, hot puddles, and in many instances, a complete absence of the once abundant Steelhead and Coho.

Recent studies correlate rapid and dramatic draw downs of flows in creeks with agricultural activities. (Kondolf, Deitch, and Merenlender 2006 & 2008; D. Hines National Marine Fisheries Service - April 29, 2009).

According to the National Marine Fisheries Service, rapid draw downs of water resources near potential or actual listed species' habitat have caused a TAKE of listed species. In the spring of 2008, fry of listed species were stranded in near shore gravels in the main stem Russian River at Hopland and Healdsburg's Felta Creek. In the Felta Creek watershed, over 200 acres are planted in grapes. This is a relatively small but very important critical habitat tributary for spawning Coho and Steelhead. Despite knowledge and warnings, it is alleged VIOLATOR withdrew water from Felta Creek and or hydrologically and hydraulically connected wells for purposes of frost protection thereby de-watering the fish habitat to a such a low level as to create an unsustainable environment for listed fish species; in some cases creating a direct kill, or TAKE, of fish and in other

circumstances causing an indirect kill by contributing to an environment hostile to fish survival. A TAKE in these same areas also took place in the Spring of 2009 (National Marine Fisheries February 19, 2009, NOAA - June 27, 2008); and, it is alleged VIOLATOR again withdrew water for purposes of frost protection, and de-watered the habitat to such a low level so as to create an unsustainable environment for listed fish species; in some cases creating a direct kill of fish and in other circumstances causing an indirect kill by contributing to an environment hostile to fish survival.

This problem is widespread, and as noted above, other tributaries are suffering similar impacts to habitat of listed species. Biologists and knowledgeable members of the concerned public have witnessed a dramatic reduction in stream flows in the Wheatfield Fork which correlate best with anthropogenic activities. The complete absence of water and of protected Steelhead where there were recently pools and Steelhead, indicates the habitat is being adversely modified resulting in a TAKE of hundreds of species which face extinction.

Continuing agricultural practices such as water diversion, land use, chemical use, and conversion have caused a TAKE and are a continuing threat of a TAKE of threatened and endangered listed species. Frost pumping, a form of water diversion, is widespread. The harmful impacts on survival and recovery for listed species following frost protection pumping are well documented. The region's significant fisheries are near extinction. Water diversions pose significant threats to salmonid survival and recovery. There are at least 1,778 miles of potential listed species habitat in the Russian River watershed. All of it is needed for the recovery of Coho, Chinook, and Steelhead as described in recovery plans. There are at least 60,640 acres of vineyards in the Russian River, 70 percent of which is within 300 feet of species habitat.

Young fish, or "fry", emerge from their eggs/redds in April or May and have poor swimming ability. They are susceptible to stranding and take refuge in cobble substrates. In the Russian River basin, fry have been observed dead from sudden agricultural water drawn down and stranding, as have older fish known as "smolts". Listed species' populations in critical habitat are at a very high risk of extinction due to frost protection irrigation as well as other farming practices described below. (EXHIBIT A- National Marine Fisheries Service - Spring 2009 PowerPoint for State Water Resources Control Board).

On stream and off stream reservoirs are major contributors to salmonid fatalities. It is alleged VIOLATOR operates reservoirs and pumps and /or directs excessive and unreasonable diversions that pull water from habitat of listed species.

This **Notice** alleges VIOLATOR is responsible for the agricultural practices described herein, resulting in harm to and a TAKE of endangered listed species. The diversion of water from listed species' habitat occurs multiple times a year. Not all occurrences are due to frost. Statistics show that diversion is more extreme in dry years when fish are at greater risk. Diversion events do not always correlate with frost risk and over response appears to be increasing.

There is clear documentation that these agricultural practices have and will continue to harm, harass or kill protected listed species.

Protected Status and Habitat Needs

The evolutionarily significant units ("ESUs") of Coho, Chinook, and Steelhead that include the Russian River and Gualala River populations are federally listed species of fish protected under the ESA. The Central California Coast ESU of Coho is listed as endangered. The California Coastal ESU of Chinook and the Northern and Central California Coast ESUs of Steelhead are listed as threatened.

Coho (*Oncorhynchus kisutch*) spend approximately the first half of their life cycle rearing and feeding in streams and small freshwater tributaries. Spawning habitat is small streams with stable gravel substrates. The remainder of their life cycle is spent foraging in estuarine and marine waters of the Pacific Ocean. Adult Coho migrate back from a marine environment into the freshwater streams and rivers of their birth in order to mate. They spawn only once and then die.

Adults return to their stream of origin to spawn and die, usually at around 3 years old. Females prepare several redds (nests) where the eggs will remain for 6 to 7 weeks until they hatch. Critical habitat was designated on May 5, 1999 for the Northern California Coast ESU. All of the water courses adjacent to VIOLATOR's lands are habitat for the listed species referenced in this **Notice**.

Chinook (*Oncorhynchus tshawytscha*) were listed as endangered in 1994. Juvenile Chinook may spend from 3 months to 2 years in fresh water before migrating to estuarine areas as smolts and then into the ocean to feed and mature. Critical habitat has been designated for the 9 listed Chinook. Chinook remain at sea for 1 to 6 years (more commonly 2 to 4 years), with the exception of a small portion of yearling males called "jack salmon", which mature in freshwater or return after 2 or 3 months in salt water. Scientific studies shows that unless smolts reach a certain size before ocean migration, they have little chance of survival.

There are different seasonal (i.e., spring, summer, autumn, or winter) "runs" in the migration of Chinook from the ocean to freshwater, even within a single river system. These runs have been identified on the basis of when adult Chinook enter freshwater to begin their spawning migration. However, distinct runs also differ in the degree of maturation at the time of river entry, the temperature and flow characteristics of their spawning site, and their actual time of spawning. Freshwater entry and spawning timing are believed to be related to local temperature and water flow regimes.

Adult female Chinook will prepare a redd in a stream area with suitable gravel type composition, water depth and velocity. The adult female Chinook may deposit eggs in 4 to 5 "nesting pockets" within a single redd. Spawning sites have larger gravel and more water flow up through the gravel than the sites used by other Pacific salmon. After laying eggs in a redd, adult Chinook will guard the redd from a few days to nearly a month before dying. Chinook eggs will hatch, depending upon water temperatures, between 3 to 5 months after deposition. Eggs are deposited at a time to ensure that young fry emerge during the following spring when the river or estuary productivity is sufficient for juvenile survival and growth.

On January 5, 2006, the National Marine Fisheries Service listed 9 DPSs of west coast Steelhead (*Oncorhynchus mykiss*) as threatened and one as endangered. Some of them had been previously listed between 1996 and 1998, but because of legal and other issues, all listings were reaffirmed and/or revised in 2006. They are a unique species. Individuals develop differently depending on their environment. While all Steelhead hatch in gravel-bottomed, fast-flowing, well-oxygenated rivers and streams, some stay in fresh water all their lives. These fish are then called rainbow trout. The Steelhead that migrate to the ocean develop a much more pointed head, become more silvery in color, and typically grow much larger than the rainbow trout which remain in fresh water.

Adults migrate from a marine environment into the freshwater streams and rivers of their birth in order to mate. Unlike other Pacific salmonids, they can spawn more than one time. Young animals feed primarily on zooplankton. Adults feed on aquatic and terrestrial insects, mollusks, crustaceans, fish eggs, minnows, and other small fishes.

The stream-maturing type (summer-run Steelhead in the Pacific Northwest and northern California) enter freshwater in a sexually immature condition between May and October and require several months to mature and spawn.

The ocean-maturing type (winter-run Steelhead in the Pacific Northwest and northern California) enter freshwater between November and April with well-developed gonads, and spawn shortly thereafter. Coastal streams are dominated by winter-run Steelhead, whereas inland Steelhead of the Columbia River basin are almost exclusively summer-run Steelhead.

Adult female Steelhead will prepare a redd in a stream area with suitable gravel type composition, water depth, and velocity. The adult female may deposit eggs in 4 to 5 nesting pockets within a single redd. The eggs hatch in 3 to 4 weeks.

Steelhead are capable of surviving in a wide range of temperature conditions. They do best where dissolved oxygen concentration is at least 7 parts per million. In streams, deep low-velocity pools are important wintering habitats. Spawning habitat consists of gravel substrates free of excessive silt. Critical habitat for 10 west coast Steelhead DPS was designated on September 2, 2005. Both salmon and Steelhead require perennial aquatic habitat and adequate stream flows 24 hours a day /365 days a year in order to live.

## ACTIONS ALLEGED TO TAKE PROTECTED SPECIES

### Habitat Modification - Upland and Riparian Destruction

The species of fish which are the subject of this **Notice** spawn and mature in freshwater, migrate to the sea to finish growing and maturing, and then return to the creeks of their birth to spawn again. These anadromous fish, in order to survive long enough to migrate to the sea, require freshwater habitat that has year round flows, deep pools, adequate food, adequate shelter, and clean cold waters.

In addition to adequate year round in-stream flows, upland and riparian habitats associated with aquatic habitat are essential to maintain salmon and Steelhead populations through their life stages. They provide food and essential shade to cool the ambient air and protect the streams from the heating effects of solar radiation when thin shade or no shade canopy is available. Maintaining the integrity of aquatic sites by protecting them from disturbance and supporting the normal functions of the aquatic habitat is critical and known to be an important factor in reducing water temperature and sedimentation of creeks.

In addition to diversion of water from creeks in large amounts, it is alleged VIOLATOR has modified and removed Class I, II, III, and IV streams, engaged in well development activities, water diversions, scraping of the land, and lined reservoir development as well as destruction of riparian vegetation, and forest conversion, which are major contributors to the TAKE of these protected species.

<u>Habitat Modification - Drastic Flow Reductions</u>

Diversions of water occur for several reasons. The effect on listed species and their habitat includes the rapid drawn down of both flows and de-watering of vital pools natural to creeks and rivers such as that those that have occurred due to the alleged actions of VIOLATOR.

Fry of listed species utilize shallow gravels in order to be safe from predators, where they can grow and become proficient swimmers. Juvenile listed species spend a summer in the creek in which they were born and are completely dependent upon adequate flows, cool water, and deep pools for growth and survival in various life stages and in order to avoid predation. As described herein, when the flows are reduced by the alleged actions of VIOLATOR, water recedes from the gravels and young fish become stranded in place where they quickly die. When pools are not drained entirely, they become warm and shallow exposing the smolts to overcrowding and predators. The rapid draw downs that have harmed and continue to harm listed species are associated with both direct diversions from surface waters and pumping of wells in proximity to creeks which has occurred and continues to occur due to illegal practices in violation of the ESA. These diversions are used to protect budding grapes from frost and are also used for heat protection and general irrigation practices.

NOTICING PARTIES allege that VIOLATOR, in the process of frost protection or other water intensive practices, has de-watered habitats at a rate too rapid for the habitat to recover. This rapid de-watering constitutes a TAKE when the habitat can no longer provide a healthy or safe environment for listed species. Listed species die in the absence of water, are trapped in unnaturally shallow warm pools or die due to sudden exposure to predators. Low levels of water due to agricultural practices creates unhealthy and often times lethal biological conditions such as nitrification and eutrophication, where they suffocate and die.

Stream flows of specific depth and volume are needed to sustain listed species in their various life stages. Spawning listed species need sufficient flows to migrate upstream to accomplish that task. Flows are needed to cover redds and newly hatched fish. Stream flow is needed for rearing purposes, to support food sources and access to food sources, and to allow movement to

refuge to avoid predation.  Flows also affect stream temperature that can cause thermal barriers, stress fish, induce disease and low growth rate, and induce predation.  The alleged practices of VIOLATOR are adversely affecting stream flows, thus harming both the listed species as well as their habitat.

Stream flows in proximity to property owned, controlled or otherwise utilized by VIOLATOR have been shown to be diminished and interrupted by alleged diversion for frost protection and irrigation.  In some cases in the Wheatfield Fork, there are apparently diversion-induced dry sections of streams which, until recent times have never been seen before.  This situation places stress on the already rare and very marginal populations of protected species which in turn ends up producing smaller smolts.  Small smolts have a very high rate of mortality in the ocean.

Habitat modification due to decreased flows often times happens dramatically in a short period of time – as short as several hours, and leaves fish stranded and dead or seriously stressed, inhibiting survival and growth.  The de-watering of habitat occurs in the spring when grape growers use creek water, reservoirs filled by withdrawals from creeks and rivers, and nearby stream wells to wet the vines and buds in order to protect them from fluctuations in temperatures associated with the area in which the grapes were allowed to be planted.  De-watering also occurs in the summertime when temperature fluctuations place the grape crop in a tenuous situation due to its susceptibility to heat.

A riparian owner is subject to the doctrine of reasonable use, which limits all rights to the use of water to that quantity reasonably required for beneficial use, and prohibits waste or unreasonable use or unreasonable methods of use or diversion. (Sec. 3, Art. XIV, Const. of Cal.; *Peabody v. City of Vallejo*, 2 Cal. 2d 351, 40 Pac. 2d 486; *Tulare Irr. Dist. et al v. Lindsay Strathmore Irr. Dist.*, 3 Cal. 2d 489, 45 Pac. 2d 972; *Rancho Santa Marqarita v. Vail*, 11 Cal. 2d 501, 81 P. 2d 533). Storage of water is regulated and improper storage of water can harm protected species.

### Authorized Land Use Impacts

The alleged agricultural practices of VIOLATOR, whether authorized or not, have harmed and continue to harm listed species by compromising the integrity of the riparian vegetation through clearing, intrusions of tractors, people, domesticated animals, and chemicals.  Healthy riparian areas provide the food source for fish as well as providing shelter and shade.  The removal and thinning of the canopy of the riparian zone has harmed and continues to harm listed species.  Such degradation of the riparian zone has caused and continues to cause increase runoff rates, decrease in recharge rates, and erosion, leading to sedimentation of critical spawning gravels.  In addition to harm caused by degradation of the riparian zones, the alleged detrimental agricultural operations of VIOLATOR have plowed under lower order watercourses essential to the health of listed species. Class II, III, and IV streams provide additional clean water in a natural flow regime to the creeks and aquifers, provide food for listed species in the Class I streams below, and act as conduits for surface flows reducing the amount of erosion that would otherwise occur if the flows were dispersed over bare ground.

The impacts of VIOLATOR'S alleged development practices including: logging, scraping, and ripping of hillsides and other natural areas; well and spring development; water diversions; construction of numerous lined ponds (further preventing adequate recharge of aquifers); and, wineries and bottling plants (consuming enormous amounts of water for production and cleaning), have a significant, cumulative impact which has already resulted in harm to the listed species of fish identified in this **Notice** which are on the verge of becoming extinct in large part due to over-appropriation of water, waste, and excessive use of water.

<u>Conversions of Forests</u>

VIOLATOR'S alleged agricultural practices which convert forests to row crops, especially near streams and on slopes, have changed microclimates from cool to hot. The winter rains are no longer absorbed into the aquifer to be released slowly back into the creeks in the summer, but rather runoff at increased rates increasing flows in the creeks in the rainy season, endangering fertilized eggs of listed species remaining in the redds, and killing fry. The shade needed in the summer is removed and soils become hotter than normal resulting in higher ambient air temperatures.

The complete or substantial transformation of wooded and forested areas to industrial vineyards associated with the alleged activities of violator has a very significant adverse affect on recharge of the groundwater needed to replenish stream flows over the hot summer months.

<u>Chemical Use</u>

Pesticides, herbicides and fertilizers used by VIOLATOR harm listed species and their habitat. Many of the chemicals used contain endocrine disruptors shown to harm listed species. Agricultural spraying and irrigation run off have caused and continue to cause the transport of chemicals into creeks and streams. Because listed species are immersed in the water their entire life, they are especially vulnerable to the introduction of pollutants into their habitat.

## LIABILITY

The ESA prohibits any person, agency, or entity from killing or harming species listed as endangered or threatened. The actions of VIOLATOR therefore, must comply with the ESA. In addition, state law requires that VIOLATOR must "take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." (Water Code Section 275 and Article 10 Section 2 of the California Constitution). Permitted and unpermitted use of water to protect grape crops from frost has been determined, through legal proceedings, to be an unreasonable, wasteful, and excessive use of water. Such use is contrary to the California Constitution. Beneficial uses of the Russian River and Gualala River include spawning, reproduction, rearing, migration, and critical habitat for salmon and Steelhead.

Although the use of water to protect wine grapes from frost has been determined to be unreasonable and harmful to protected species, such findings have nevertheless been ignored in the Russian and Gualala River watersheds. VIOLATOR allegedly improperly diverted, impounded, or

otherwise appropriated water without due regard for these findings. VIOLATOR continues, despite the legal determination, to engage in the practice of frost protection. In so doing, VIOLATOR has contributed and caused direct harm to protected species. Although required to do so by both federal and state law, VIOLATOR has failed to protect beneficial uses of water including managing for species listed as endangered or threatened under the ESA. For example, although water for frost protection has already been determined to be an unreasonable use, VIOLATOR has failed to properly manage its property and activities to avoid this practice in the Russian basin. VIOLATOR has failed to avoid trespass onto the state's waters in the spring and summer (Title 23 CCR Section 1052). The result is repeated, rapid de-watering of critical habitat and modification of habitat resulting in repeated TAKE of listed fish species protected under the ESA. Because VIOLATOR has failed to carry out its responsibilities, a direct TAKE of species protected under the ESA has occurred.

VIOLATOR is governed by several principles including the requirement that anyone seeking to appropriate water from creeks, lakes, rivers, or subterranean streams must file a Statement of Diversion with the SWRCB Division of Water Rights and apply for or register that use or claim of right. Water cannot be stored and withheld for a deferred use (other than regulatory storage) under claim of riparian right. *Seneca Consol. Gold Mines Co. v. Great Western Power Co.*, 209 Cal. 206, 287 Pac. 93; *Colorado Power Co. v. Pac. Gas and Electric Co.*, 218 Cal. 559, 24 p. 2d 495; *Moore v. California Oregon Power Co.*, 22 Cal. 2d 725, 140 p. 2d 798). That is to say, a riparian owner is subject to the doctrine of reasonable use, which limits all rights to the use of water to that quantity reasonably required for beneficial use, and prohibits waste or unreasonable use or unreasonable methods of use or diversion. (Sec. 3, Article XIV, Const. of Cal.; *Peabody v. City of Vallejo*, 2 Cal. 2d 351, 40 Pac. 2d 486; *Tulare Irr. Dist. et al v. Lindsay Strathmore Irr. Dist.*, 3 Cal. 2d 489, 45 Pac. 2d 972; *Rancho Santa Marqarita v. Vail*, 11 Cal. 2d 501, 81 P. 2d 533) .

VIOLATOR has a duty to consider public trust values before usurping water. VIOLATOR must limit the water to be appropriated in order that such use will not be an unreasonable quantity of water or have unreasonable effects on public trust or public interest uses of water. (See Title 23, Chapter 3, subchapter 2, Articles 18 and 22 of the California Code of Regulations; California Water Code Section 275 et. seq.; and California Water Code Section 1050, et. seq.) .

Water in many streams has already been fully appropriated during the dry seasons of the year. As is the case in the Russian River and Gualala River watersheds referenced herein and many others including the Mark West, Shasta and Scott Rivers, VIOLATOR has allegedly over-appropriated hydrologically and hydraulically connected groundwater and surface waters and has thereby harmed protected species and violated the public trust.

Lastly, applications to divert water must be reviewed and analyzed for possible adverse cumulative environmental impacts as required by the California Environmental Quality Act of 1970. The de-watering of creeks and rivers is a significant adverse cumulative environmental impact caused by the legal and illegal diversions and impoundments/storage of water to the detriment of beneficial uses and protected species.

## VIOLATIONS

### ESA § 9

ESA prohibits the TAKE of protected species.  The acts, operations, and failure to act properly on the part of VIOLATOR have allegedly resulted in a TAKE of protected species which includes harm to habitat.  The alleged TAKE of protected species has occurred in Felta Creek, a tributary to Dry Creek thence the Russian River.

In April of 2008, law enforcement of the National Marine Fisheries Service was notified of two episodes of fish stranding mortality: Steelhead fry perished along the mainstream Russian River near Hopland, and Coho fry died in Felta Creek, near Healdsburg.  Similar impacts were documented on Maacama Creek, a tributary of the Russian River.  Although a repeat of this biological disaster was predicted and regulatory agencies and the growing community were warned to take immediate steps to prevent such harm, the fish kills occurred again in the same places in the spring of 2009.

Biologists have also documented unprecedented draw downs in the Gualala watershed which track with large changes in the landscape including conversions of forests to vineyards.  Such draw downs are associated with the complete loss of in-stream pools where Steelhead, until very recently, survived the long, hot summer before migrating and reproducing when the rains did come.

Agricultural practices are required by law to be conducted in such a manner so as to avoid impacts to listed species.  The agricultural practices of VIOLATOR as described herein have allegedly harmed listed species.  In Sonoma County, thousands of acres of water consuming, recharge depleting and land clearing activities have occurred within 300 feet of listed species' habitat, critical habitat, and potential habitat. Water development and supply activities by VIOLATOR proceed without due regard for the impacts on listed species' habitat. VIOLATOR pursues individual projects often without due regard for the impact on listed species or their habitat. Such activities as described herein have allegedly resulted in and continue to result in a direct and indirect TAKE of the listed species.

VIOLATOR is in violation of ESA § 9, 16 U.S.C. §1538, if it has engaged in the activities described herein that TAKE protected species. It is alleged that VIOLATOR'S operations, including diversions and pumping of water near critical habitat, have repeatedly killed threatened and endangered listed species.

It is expected that frost and heat protection of VIOLATOR'S crops will continue.  These activities, including water development and use must be conducted in a manner which will not harm listed species by modifying the habitat or directly or indirectly harming individuals of the species. Moreover, vineyards are associated with intensive chemical use which contributes to the degradation of important aquatic habitat and movement corridors, negatively impacting listed species and their food sources as well.  These harmful activities are continuing in nature.

ESA § 10

NOTICING PARTIES allege VIOLATOR has not applied for an incidental TAKE permit under ESA § 10, 16 U.S.C. § 1539. VIOLATOR does not fall within the category of those permitted to incidentally TAKE endangered species, such as research scientists or restoration experts. Acts, operations, and failure to act properly on the part of VIOLATOR has allegedly resulted in the unpermitted TAKE of protected species which includes harm to habitat.

## IDENTIFICATION OF ENTITIES BRINGING NOTICE

The entities bringing this **Notice** are Northern California River Watch and Coast Action Group identified collectively throughout this Notice as "NOTICING PARTIES".

Northern California River Watch is a non-profit corporation organized under the laws of the State of California, dedicated to the protection and enhancement of the waters of the State of California including all rivers, creeks, streams and groundwater in Northern California. Northern California River Watch is located at 500 North Main Street, Suite 110, Sebastopol, CA 95472, Telephone and Facsimile 707-824-4372, Email:US@ncriverwatch.org.

Coast Action Group is an organization dedicated to the protection of fishery and water quality resources on the north coast of California. Coast Action Group has a history of actions supporting the protection of fish, forest, and water quality resources dating back to 1990. Coast Action Group exists in order to protect fish and wildlife through state and federal water laws. It comments on issues of statewide concern in order to protect in-stream flows and water quality. It is currently participating in meetings and on a task force attempting to deal with important issues which affect listed species of Coho and Steelhead. Coast Action Group is located at P.O. Box 215, Point Arena, CA 95468, Telephone 707-882-2484, Email: alevine@ mcn.org.

## CONTACT INFORMATION

NOTICING PARTIES have retained legal counsel to represent them in this matter. All communications with respect to the issues raised in this **Notice** should be addressed to the following counsel:

Jack Silver, Esquire
Law Office of Jack Silver
P.O. Box 5469
Santa Rosa, CA 95402-5469
Tel.    707-528-8175
Fax.    707-528-8675

## CONCLUSION

The violations as set forth in this **Notice** affect the health and enjoyment of the members of NOTICING PARTIES who reside, work and recreate in the affected area. NOTICING PARTIES

and their respective members use these watersheds for domestic water supply, agricultural water supply, recreation, sports, fishing, swimming, hiking, photography, nature walks, restoration activities, and the like.  The health, property rights, use, and enjoyment of these areas by the members of NOTICING PARTIES are specifically impaired by the violations of the ESA as alleged herein.

NOTICING PARTIES believe this **Notice** sufficiently states grounds for filing suit.  At the close of the 60-day notice period or shortly thereafter NOTICING PARTIES intend to file a citizens' suit under the ESA against VIOLATOR for the violations enumerated herein. During the 60-day notice period NOTICING PARTIES are willing to discuss effective remedies for the violations described in this **Notice.**

However, if VIOLATOR wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated within the next 20 days so that they may be completed before the end of the 60-day notice period.  NOTICING PARTIES do not intend to delay the filing of a lawsuit if discussions are continuing when the  notice period ends.

Very truly yours,

Jack Silver

JS:lhm
Enclosure - Exhibit A

# EXHIBIT B

# Law Office of Jack Silver



P.O. Box 5469         Santa Rosa, California 95402
Phone  707-528-8175    Fax  707-528-8675
lhm28843@sbcglobal.net

*Via Certified Mail -  Return Receipt Requested*

November 26, 2010

Mr. Clinton Folger
Ms. Ruth Stadnik
Mr. Nick Brodrick
Green Pastures Valley, LLC
1470 Felta Road
Healdsburg, CA 95448

Gary Locke -Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

### NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE ENDANGERED SPECIES ACT

Dear Mr. Folger, Ms. Stadnik, Mr. Brodrick and Secretary Locke:

**NOTICE**

   The  Endangered Species Act ("ESA") §11(g), 16 U.S.C. § 1540(g) requires that sixty days prior to the initiation of a civil action under the ESA an entity must give notice of its intent to sue to the alleged violator and the Secretary of Interior or Commerce.

   I am writing on behalf of Northern California River Watch and Coast Action Group, collectively referred to hereafter as "NOTICING  PARTIES," to notify the limited liability company organized under the laws of the State of California known as Green Valley Pastures, LLC; and, to notify Clinton Folger, Ruth Stadnik, and Nick Brodrick as individuals and in their capacities as members of Green Pastures Valley, LLC, all of whom are hereafter collectively referred to as "VIOLATORS," of alleged violations of ESA § 9, 16 U.S.C.

§1538 with respect to harm and unauthorized TAKE of federally protected salmonid species in Felta Creek as a result of VIOLATORS' operations and vineyard development activities as further described in this Notice, on real property at 1470 Felta Road in Healdsburg, California.

After expiration of the 60-day notice period, NOTICING PARTIES intend to amend the current litigation pending in federal court described on page 15 of this Notice to enjoin VIOLATORS from alleged violations of the ESA and/or regulations issued under the authority of the ESA.

NOTICING PARTIES also give notice to the Secretary of Commerce that after the expiration of the 60-day hold period, NOTICING PARTIES intend to file amend the current litigation to enforce the ESA, unless a Secretary has commenced an action to impose a penalty pursuant to 16 U.S.C. § 1540(a); or, if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress the violations of the ESA by VIOLATORS as alleged in this Notice.

**STATUTORY FRAMEWORK**

Under ESA § 9, 16 U.S.C. § 1538(a)(1)(B), it is unlawful for any person to TAKE an endangered species. Under ESA § 4(19), 16 U.S.C. § 1532(19), the term "TAKE" includes to harass, harm, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct.  TAKE includes direct as well as indirect harm and need not be purposeful.  See *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. § 687, 704 (1995).  In fact, a TAKE may even be the result of an accident.  See *National Wildlife Federation v. Burlington Northern Railroad*, 23 F.3d 1508, 1512 (9th Cir. 1994).  TAKE includes habitat modification that actually kills or injures an endangered species.

ESA § 9 is a strict liability statute, meaning that the illegal TAKING need not be intentional. Cumulative acts resulting in a TAKE are also actionable.  Therefore, if water diversion in a habitat is caused by several entities rather than one, all entities may be prosecuted even if the act of one was insufficient to cause a TAKE.  Attempting to cause almost any level of injury to an endangered species is also prohibited by law. A TAKE is defined in the ESA in the broadest possible manner to include every conceivable way in which a person or entity can TAKE or attempt to TAKE any fish or wildlife.  *Defenders of Wildlife v. Administrator*, *EPA*, 882 F.3d 1294, 1300 (8th Cir. 1989). The ESA § 9 prohibition on TAKE applies equally to threatened species.

The ESA not only prohibits the acts of those parties that directly exact the TAKING, but also bans acts by a third party which bring about the acts exacting a TAKE. For instance, a governmental, third party entity pursuant to whose authority an actor directly exacts a

TAKING may be deemed to have violated the ESA.  *Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir.1997)  See also *Loggerhead Turtle v. County Council of Volusia Co.*, 148 F.3d 1231 (11th Cir.1998); *Sierra Club v. Yeutter,* 926 F.2d 429 (5th Cir. 1991).

The ESA has a broad citizen suit provision allowing any entity to commence a civil suit on its own behalf to enjoin any entity that is alleged to be in violation of any provision of the ESA or regulation issued under the authority thereof.  A plaintiff can seek to enjoin both present activities which constitute an ongoing TAKE and future activities reasonably likely to result in a TAKE.  See *Murrelet v. Pacific Lumber Co.*, 83 F.3d 1060, 1066 (9th Cir. 1996).

## FACTUAL BACKGROUND

De-watering of rivers and streams is occurring in Sonoma and Mendocino Counties and has been linked to excessive and unreasonable diversions, over allocation of water resources, illegal diversions and illegal storage by agricultural interests. For example, in 1997, the State Water Resources Control Board ("SWRCB") staff released a report identifying vineyard practices that adversely impact listed species of fish struggling to survive in the Russian River Basin and its tributaries.  The report found that frost protection activities harmed listed species of fish including Coho, Chinook, and Steelhead.  (As used herein, the term "listed species" will refer to Coho, Chinook, and/or Steelhead unless otherwise designated or described).  Although this has been known since at least 1972 when the courts found that frost protection activities in the Napa River Basin were harmful to listed fish species, such frost protection activities in Sonoma and Mendocino Counties continue to occur and have increased over the years.

In 2000, SWRCB staff referred to its 1997 report emphasizing that under certain conditions, adequate water is available for appropriation in the winter, but no water is available in the spring, summer or autumn without the risk of harming fishery resources. (Staff Report SWRCB 7/2000).  The Gualala River watershed is experiencing large conversions of the forests to vineyards and associated de-watering of that important fish habitat.  Hundreds if not thousands of acres of vineyards have recently been planted by a relatively few large landholders above the Gualala River.  The Wheatfield Fork of the Gualala River now has documented dry stretches that have historically supported Steelhead, rearing pools, and flows sufficient to keep baby salmon and Steelhead, also known as fry, secure until such time as they are proficient swimmers.  Removal of extensive amounts of vegetation and the subsequent intensive grading, grubbing, ripping, and planting of vineyards on the slopes above the Wheatfield Fork and its tributaries has changed the hydrology of the area. Such intensive agricultural activity requires substantial amounts of water and adversely impacts recharge and erosion rates.  It is alleged that the water needs of new vineyards are adversely affecting in- stream flows in the Wheatfield Fork in an unreasonable manner, resulting in complete loss of flows in several areas of the stream at certain times of the year.

The Wheatfield Fork used to provide flows adequate to support juveniles of listed species until the time they made their way downstream to the sea to mature before their return migration to spawn. Streams that supported protected Steelhead and Coho only a few years ago, are now turning into deserts. The Russian River, including Felta Creek and the Wheatfield Fork of the Gualala River, are being especially hard hit. The habitat of listed species is being decimated. Where there were pools last year and the year before, there is dried vegetation, hot exposed gravels, hot puddles, and in many instances, a complete absence of the once abundant Steelhead and Coho.

Recent studies correlate rapid and dramatic draw downs of flows in creeks with agricultural activities. (Kondolf, Deitch, and Merenlender 2006 & 2008; D. Hines National Marine Fisheries Service - April 29, 2009).

According to the National Marine Fisheries Service, rapid draw downs of water resources near potential or actual listed species' habitat have caused a TAKE of listed species. In the spring of 2008, fry of listed species were stranded in near shore gravels in the main stem Russian River at Hopland and Felta Creek in Healdsburg. In the Felta Creek watershed, over 200 acres are planted in grapes. This is a relatively small but very important critical habitat tributary for spawning Coho and Steelhead. Despite knowledge and warnings, it is alleged VIOLATORS withdrew water from Felta Creek and or hydrologically and hydraulically connected wells for purposes of frost protection thereby de-watering the fish habitat to a such a low level as to create an unsustainable environment for listed fish species; in some cases creating a direct kill, or TAKE, of fish and in other circumstances causing an indirect kill by contributing to an environment hostile to fish survival. A TAKE in these same areas also took place in the Spring of 2009 (National Marine Fisheries February 19, 2009, NOAA - June 27, 2008); and, it is alleged VIOLATORS again withdrew water for purposes of frost protection, and de-watered the habitat to such a low level so as to create an unsustainable environment for listed fish species; in some cases creating a direct kill of fish and in other circumstances causing an indirect kill by contributing to an environment hostile to fish survival.

This problem is widespread, and as noted above, other tributaries are suffering similar impacts to habitat of listed species. Biologists and knowledgeable members of the concerned public have witnessed a dramatic reduction in stream flows in the Wheatfield Fork which correlate best with anthropogenic activities. The complete absence of water and of protected Steelhead where there were recently pools and Steelhead, indicates the habitat is being adversely modified resulting in a TAKE of hundreds of species which face extinction.

Continuing agricultural practices such as water diversion, land use, chemical use, and conversion have caused a TAKE and are a continuing threat of a TAKE of threatened and endangered listed species. Frost pumping, a form of water diversion, is widespread. The

harmful impacts on survival and recovery for listed species following frost protection pumping are well documented. The region's significant fisheries are near extinction. Water diversions pose significant threats to salmonid survival and recovery. There are at least 1,778 miles of potential listed species habitat in the Russian River watershed. All of it is needed for the recovery of Coho, Chinook, and Steelhead as described in recovery plans. There are at least 60,640 acres of vineyards in the Russian River, 70 percent of which is within 300 feet of species habitat.

Young fish, or "fry", emerge from their eggs/redds in the springtime and have poor swimming ability. They are susceptible to stranding and take refuge in cobble substrates. In the Russian River basin, fry have been observed dead from sudden agricultural water drawn down and stranding, as have older fish known as "smolts". Salmon raised by the Russian River Coho Salmon Captive Broodstock Program are equally susceptible to low flow conditions. Listed species' populations in critical habitat are at a very high risk of extinction due to frost protection irrigation as well as other farming practices described below.

On stream and off stream reservoirs are major contributors to salmonid fatalities. It is alleged VIOLATORS operate reservoirs and pumps and /or direct excessive and unreasonable diversions that pull water from habitat of listed species.

This Notice alleges VIOLATORS are responsible for the agricultural practices described herein, resulting in harm to and a TAKE of endangered listed species. The diversion of water from listed species' habitat occurs multiple times a year. Not all occurrences are due to frost. Statistics show that diversion is more extreme in dry years when fish are at greater risk. Diversion events do not always correlate with frost risk and over response appears to be increasing. There is clear documentation that these agricultural practices have and will continue to harm, harass or kill protected listed species.

<u>Protected Status and Habitat Needs</u>

The evolutionarily significant units ("ESUs") of Coho, Chinook, and Steelhead that include the Russian River and Gualala River populations are federally listed species of fish protected under the ESA. The Central California Coast ESU of Coho is listed as endangered. The California Coastal ESU of Chinook and the Northern and Central California Coast ESUs of Steelhead are listed as threatened.

Coho (*Oncorhynchus kisutch*) spend approximately the first half of their life cycle rearing and feeding in streams and small freshwater tributaries. Spawning habitat is small streams with stable gravel substrates. The remainder of their life cycle is spent foraging in estuarine and marine waters of the Pacific Ocean. Adult Coho migrate back from a marine environment into the freshwater streams and rivers of their birth in order to mate. Adults

return to their stream of origin to spawn and die, usually at around 3 years old. Females prepare several redds (nests) where the eggs will remain for 6 to 7 weeks until they hatch. Critical habitat was designated on May 5, 1999 for the Northern California Coast ESU. All of the water courses adjacent to VIOLATORS' lands are habitat for the listed species referenced in this Notice.

Chinook (*Oncorhynchus tshawytscha*) were listed as endangered in 1994. Juvenile Chinook may spend from 3 months to 2 years in fresh water before migrating to estuarine areas as smolts and then into the ocean to feed and mature. Critical habitat has been designated for the 9 listed Chinook. Chinook remain at sea for 1 to 6 years (more commonly 2 to 4 years), with the exception of a small portion of yearling males called "jack salmon", which mature in freshwater or return after 2 or 3 months in salt water. Scientific studies shows that unless smolts reach a certain size before ocean migration, they have little chance of survival.

There are different seasonal (i.e., spring, summer, autumn, or winter) "runs" in the migration of Chinook from the ocean to freshwater, even within a single river system. These runs have been identified on the basis of when adult Chinook enter freshwater to begin their spawning migration. However, distinct runs also differ in the degree of maturation at the time of river entry, the temperature and flow characteristics of their spawning site, and their actual time of spawning. Freshwater entry and spawning timing are believed to be related to local temperature and water flow regimes.

Adult female Chinook will prepare a redd in a stream area with suitable gravel type composition, water depth and velocity. The adult female Chinook may deposit eggs in 4 to 5 "nesting pockets" within a single redd. Spawning sites have larger gravel and more water flow up through the gravel than the sites used by other Pacific salmon. After laying eggs in a redd, adult Chinook will guard the redd from a few days to nearly a month before dying. Chinook eggs will hatch, depending upon water temperatures, between 3 to 5 months after deposition. Eggs are deposited at a time to ensure that young fry emerge during the following spring when the river or estuary productivity is sufficient for juvenile survival and growth.

On January 5, 2006, the National Marine Fisheries Service listed 9 DPS (distinct population segments) of west coast Steelhead (*Oncorhynchus mykiss*) as threatened and one as endangered. Some of them had been previously listed between 1996 and 1998, but because of legal and other issues, all listings were reaffirmed and/or revised in 2006. They are a unique species. Individuals develop differently depending on their environment. While all Steelhead hatch in gravel-bottomed, fast-flowing, well-oxygenated rivers and streams, some stay in fresh water all their lives. These fish are then called rainbow trout. The Steelhead that migrate to the ocean develop a much more pointed head, become more silvery

in color, and typically grow much larger than the rainbow trout which remain in fresh water. Adults migrate from a marine environment into the freshwater streams and rivers of their birth in order to mate.  Unlike other Pacific salmonids, they can spawn more than one time. Young animals feed primarily on zooplankton.  Adults feed on aquatic and terrestrial insects, mollusks, crustaceans, fish eggs, minnows, and other small fishes.

The stream-maturing type (summer-run Steelhead in the Pacific Northwest and northern California) enter freshwater in a sexually immature condition between May and October and require several months to mature and spawn.

The ocean-maturing type (winter-run Steelhead in the Pacific Northwest and northern California) enter freshwater between November and April with well-developed gonads, and spawn shortly thereafter.  Coastal streams are dominated by winter-run Steelhead, whereas inland Steelhead of the Columbia River basin are almost exclusively summer-run Steelhead.

Adult female Steelhead will prepare a redd in a stream area with suitable gravel type composition, water depth, and velocity.  The adult female may deposit eggs in 4 to 5 nesting pockets within a single redd. The eggs hatch in 3 to 4 weeks.

Steelhead are capable of surviving in a wide range of temperature conditions.  They do best where dissolved oxygen concentration is at least 7 parts per million.  In streams, deep low-velocity pools are important wintering habitats.  Spawning habitat consists of gravel substrates free of excessive silt.  Critical  habitat for 10 west coast Steelhead DPS was designated on September 2, 2005.  Both salmon and Steelhead require perennial aquatic habitat and adequate stream flows 24 hours a day /365 days a year in order to live.

## ACTIONS ALLEGED TO TAKE PROTECTED SPECIES

Habitat Modification - Upland and Riparian Destruction

The species of fish which are the subject of this Notice spawn and mature in freshwater, migrate to the sea to finish growing and maturing, and then return to the creeks of their birth to spawn again.  These anadromous fish, in order to survive long enough to migrate to the sea, require freshwater habitat that has year round flows, deep pools, adequate food, adequate shelter, and clean cold waters.

In addition to adequate year round in-stream flows, upland and riparian habitats associated with aquatic habitat are essential to maintain salmon and Steelhead populations through their life stages. They provide food and essential shade to cool the ambient air and protect the streams from the heating effects of solar radiation when thin shade or no shade canopy is available.  Maintaining the integrity of aquatic sites by protecting them from

disturbance and supporting the normal functions of the aquatic habitat is critical and known to be an important factor in reducing water temperature and sedimentation of creeks.

In addition to diversion of water from creeks in large amounts, it is alleged VIOLATORS have modified and removed Class I, II, and III streams, engaged in well development activities, water diversions, scraping of the land, and lined reservoir development as well as destruction of riparian vegetation, and forest conversion, which are major contributors to the TAKE of these protected species.

Habitat Modification - Drastic Flow Reductions

Diversions of water occur for several reasons. The effect on listed species and their habitat includes the rapid drawn down of both flows and de-watering of vital pools natural to creeks and rivers such as that those that have occurred due to the alleged actions of VIOLATORS.

Fry of listed species utilize shallow gravels in order to be safe from predators, where they can grow and become proficient swimmers. Juvenile listed species spend a summer in the creek in which they were born and are completely dependent upon adequate flows, cool water, and deep pools for growth and survival in various life stages and in order to avoid predation. As described herein, when the flows are reduced by the alleged actions of VIOLATORS, water recedes from the gravels and young fish become stranded in place where they quickly die. When pools are not drained entirely, they become warm and shallow exposing the smolts to overcrowding and predators. The rapid draw downs that have harmed and continue to harm listed species are associated with both direct diversions from surface waters and pumping of wells in proximity to creeks which has occurred and continues to occur due to illegal practices in violation of the ESA. These diversions are used to protect budding grapes from frost and are also used for heat protection and general irrigation practices.

NOTICING PARTIES allege that VIOLATORS, in the process of frost protection or other water intensive practices, have de-watered habitats at a rate too rapid for the habitat to recover. This rapid de-watering constitutes a TAKE when the habitat can no longer provide a healthy or safe environment for listed species. Listed species die in the absence of water, are trapped in unnaturally shallow warm pools or die due to sudden exposure to predators. Low levels of water due to agricultural practices creates unhealthy and often times lethal biological conditions such as nitrification and eutrophication, where they suffocate and die.

Stream flows of specific depth and volume are needed to sustain listed species in their various life stages. Spawning listed species need sufficient flows to migrate upstream to accomplish that task. Flows are needed to cover redds and newly hatched fish. Stream flow

is needed for rearing purposes, to support food sources and access to food sources, and to allow movement to refuge to avoid predation. Flows also affect stream temperature that can cause thermal barriers, stress fish, induce disease and low growth rate, and induce predation. The alleged practices of VIOLATORS are adversely affecting stream flows, thus harming both the listed species as well as their habitat.

Stream flows in proximity to property owned, controlled or otherwise utilized by VIOLATORS have been shown to be diminished and interrupted by alleged diversion for frost protection and irrigation. In some cases in the Wheatfield Fork, there are apparently diversion-induced dry sections of streams which, until recent times have never been seen before. This situation places stress on the already rare and very marginal populations of protected species which in turn ends up producing smaller smolts. Small smolts have a very high rate of mortality in the ocean.

Habitat modification due to decreased flows often times happens dramatically in a short period of time – as short as several hours, and leaves fish stranded and dead or seriously stressed, inhibiting survival and growth. The de-watering of habitat occurs in the spring when grape growers use creek water, reservoirs filled by withdrawals from creeks and rivers, and nearby stream wells to wet the vines and buds in order to protect them from fluctuations in temperatures associated with the area in which the grapes were allowed to be planted. De-watering also occurs in the summertime when temperature fluctuations place the grape crop in a tenuous situation due to its susceptibility to heat.

A riparian owner is subject to the doctrine of reasonable use, which limits all rights to the use of water to that quantity reasonably required for beneficial use, and prohibits waste or unreasonable use or unreasonable methods of use or diversion. (Sec. 3, Art. XIV, Const. of Cal.; *Peabody v. City of Vallejo*, 2 Cal. 2d 351, 40 Pac. 2d 486; *Tulare Irr. Dist. et al v. Lindsay Strathmore Irr. Dist.*, 3 Cal. 2d 489, 45 Pac. 2d 972; *Rancho Santa Marqarita v. Vail*, 11 Cal. 2d 501, 81 P. 2d 533). Storage of water is regulated and improper storage of water can harm protected species.

<u>Authorized Land Use Impacts</u>

The alleged agricultural practices of VIOLATORS, whether authorized or not, have harmed and continue to harm listed species by compromising the integrity of the riparian vegetation through clearing, intrusions of tractors, people, domesticated animals, and chemicals. Healthy riparian areas provide the food source for fish as well as providing shelter and shade. The removal and thinning of the canopy of the riparian zone has harmed and continues to harm listed species. Such degradation of the riparian zone has caused and continues to cause increase runoff rates, decrease in recharge rates, and erosion, leading to sedimentation of critical spawning gravels. In addition to harm caused by degradation of the

riparian zones, the alleged detrimental agricultural operations of VIOLATORS have plowed under lower order watercourses essential to the health of listed species. Class II and III streams provide additional clean water in a natural flow regime to the creeks and aquifers, provide food for listed species in the Class I streams below, and act as conduits for surface flows reducing the amount of erosion that would otherwise occur if the flows were dispersed over bare ground.

The impacts of VIOLATORS' alleged development practices including: logging, scraping, and ripping of hillsides and other natural areas; well and spring development; water diversions; construction of numerous lined ponds (further preventing adequate recharge of aquifers); and, wineries and bottling plants (consuming enormous amounts of water for production and cleaning), have a significant, cumulative impact which has already resulted in harm to the listed species of fish identified in this Notice which are on the verge of becoming extinct in large part due to over- appropriation of water, waste, and excessive use of water.

<u>Conversions of Forests</u>

VIOLATORS' alleged agricultural practices which convert forests to row crops, especially near streams and on slopes, have changed microclimates from cool to hot. The winter rains are no longer absorbed into the aquifer to be released slowly back into the creeks in the summer, but rather runoff at increased rates increasing flows in the creeks in the rainy season, endangering fertilized eggs of listed species remaining in the redds, and killing fry. The shade needed in the summer is removed and soils become hotter than normal resulting in higher ambient air temperatures.

The complete or substantial transformation of wooded and forested areas to industrial vineyards associated with the alleged activities of violator has a very significant adverse affect on recharge of the groundwater needed to replenish stream flows over the hot summer months.

<u>Chemical Use</u>

Pesticides, herbicides and fertilizers used by VIOLATORS harm listed species and their habitat. Many of the chemicals used contain endocrine disruptors shown to harm listed species. Agricultural spraying and irrigation run off have caused and continue to cause the transport of chemicals into creeks and streams. Because listed species are immersed in the water their entire life, they are especially vulnerable to the introduction of pollutants into their habitat.

## LIABILITY

Agency Notice of Violation

On May 6, 2010, the National Oceanic and Atmospheric Administration, representing the National Marine Fisheries Service issued VIOLATORS a Notice of Violation and Assessment of Administrative Penalty for violations of the ESA. A copy of that Notice of Violations is attached hereto as Exhibit A and fully incorporated into this Notice.

The ESA prohibits any person, agency, or entity from killing or harming species listed as endangered or threatened. The actions of VIOLATORS therefore, must comply with the ESA. In addition, state law requires that VIOLATORS must "take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." (Water Code Section 275 and Article 10 Section 2 of the California Constitution). Permitted and unpermitted use of water to protect grape crops from frost has been determined, through legal proceedings, to be an unreasonable, wasteful, and excessive use of water. Such use is contrary to the California Constitution. Beneficial uses of the Russian River and Gualala River include spawning, reproduction, rearing, migration, and critical habitat for salmon and Steelhead.

Although the use of water to protect wine grapes from frost has been determined to be unreasonable and harmful to protected species, such findings have nevertheless been ignored in the Russian and Gualala River watersheds. VIOLATORS allegedly improperly diverted, impounded, or otherwise appropriated water without due regard for these findings. VIOLATORS continue, despite the legal determination, to engage in the practice of frost protection. In so doing, VIOLATORS have contributed and caused direct harm to protected species. Although required to do so by both federal and state law, VIOLATORS have failed to protect beneficial uses of water including managing for species listed as endangered or threatened under the ESA. For example, although water for frost protection has already been determined to be an unreasonable use, VIOLATORS have failed to properly manage their property and activities to avoid this practice in the Russian basin. VIOLATORS have failed to avoid trespass onto the state's waters in the spring and summer (Title 23 CCR Section 1052). The result is repeated, rapid de-watering of critical habitat and modification of habitat resulting in repeated TAKE of listed fish species protected under the ESA. Because VIOLATORS have failed to carry out their responsibilities, a direct TAKE of species protected under the ESA has occurred.

VIOLATORS are governed by several principles including the requirement that anyone seeking to appropriate water from creeks, lakes, rivers, or subterranean streams must file a Statement of Diversion with the SWRCB Division of Water Rights and apply for or register

that use or claim of right.  Water cannot be stored and withheld for a deferred use (other than regulatory storage) under claim of riparian right. *Seneca Consol. Gold Mines Co. v. Great Western Power Co.*, 209 Cal. 206, 287 Pac. 93; *Colorado Power Co. v. Pac. Gas and Electric Co.*, 218 Cal. 559, 24 p. 2d 495;  *Moore v. California Oregon Power Co.*, 22 Cal. 2d 725, 140 p. 2d 798).  That is to say, a riparian owner is subject to the doctrine of reasonable use, which limits all rights to the use of water to that quantity reasonably required for beneficial use, and prohibits waste or unreasonable use or unreasonable methods of use or diversion. (Sec. 3, Article XIV, Const. of Cal.; *Peabody v. City of Vallejo*, 2 Cal. 2d 351, 40 Pac. 2d 486; *Tulare Irr. Dist. et al v. Lindsay Strathmore Irr. Dist.*, 3 Cal. 2d 489, 45 Pac. 2d 972; *Rancho Santa Marqarita v. Vail*, 11 Cal. 2d 501, 81 P. 2d 533).

Applications to divert water must be reviewed and analyzed for possible adverse cumulative environmental impacts as required by the California Environmental Quality Act of 1970. VIOLATORS have not complied with the California Environmental Quality Act, for example, by installing flash dams in Felta Creek without review by the California Department of Fish and Game.  The de-watering of creeks and rivers is a significant adverse cumulative environmental impact caused by the legal and illegal diversions and impoundments/storage of water to the detriment of beneficial uses and protected species.

## VIOLATIONS

ESA § 9

ESA prohibits the TAKE of protected species.  The acts, operations, and failure to act properly on the part of VIOLATORS have allegedly resulted in a TAKE of protected species which includes harm to habitat.  The alleged TAKE of protected species has occurred in Felta Creek, an important tributary in the Russian River basin.

In April of 2008, law enforcement of the National Marine Fisheries Service was notified of two episodes of fish stranding mortality:  Steelhead fry perished along the mainstream Russian River near Hopland, and Coho fry and Steelhead fry died in Felta Creek, near Healdsburg.  Similar impacts were documented on Maacama Creek, a tributary of the Russian River.  Although a repeat of this biological disaster was predicted and regulatory agencies and the growing community were warned to take immediate steps to prevent such harm, the fish kills occurred again in the same places in the spring of 2009.

Biologists have also documented unprecedented draw downs in the Gualala watershed which track with large changes in the landscape including conversions of forests to vineyards.  Such draw downs are associated with the complete loss of in-stream pools where Steelhead, until very recently, survived the long, hot summer before migrating and reproducing when the rains did come.

Agricultural practices are required by law to be conducted in such a manner so as to avoid impacts to listed species. The agricultural practices of VIOLATORS as described herein have allegedly harmed listed species. In Sonoma County, thousands of acres of water consuming, recharge depleting and land clearing activities have occurred within 300 feet of listed species' habitat, critical habitat, and potential habitat. Water development and supply activities by VIOLATORS proceed without due regard for the impacts on listed species' habitat. VIOLATORS pursue individual projects often without due regard for the impact on listed species or their habitat. Such activities as described herein have allegedly resulted in and continue to result in a direct and indirect TAKE of the listed species.

VIOLATORS are in violation of ESA § 9, 16 U.S.C. §1538, if they have engaged in the activities described herein that TAKE protected species. It is alleged that VIOLATORS' operations, including diversions and pumping of water near critical habitat, have repeatedly killed threatened and endangered listed species.

It is expected that frost and heat protection of VIOLATORS' crops will continue. These activities, including water development and use must be conducted in a manner which will not harm listed species by modifying the habitat or directly or indirectly harming individuals of the species. Moreover, vineyards are associated with intensive chemical use which contributes to the degradation of important aquatic habitat and movement corridors, negatively impacting listed species and their food sources as well. These harmful activities are continuing in nature.

ESA § 10

NOTICING PARTIES allege VIOLATORS have not applied for an incidental TAKE permit under ESA § 10, 16 U.S.C. § 1539. VIOLATORS do not fall within the category of those permitted to incidentally TAKE endangered species, such as research scientists or restoration experts. Acts, operations, and failure to act properly on the part of VIOLATORS have allegedly resulted in the unpermitted TAKE of protected species which includes harm to habitat.

**IDENTIFICATION OF ENTITIES BRINGING NOTICE**

The entities bringing this Notice are Northern California River Watch and Coast Action Group identified collectively throughout this Notice as "NOTICING PARTIES".

Northern California River Watch is a non-profit corporation organized under the laws of the State of California, dedicated to the protection and enhancement of the waters of the

State of California including all rivers, creeks, streams and groundwater in Northern California. Northern California River Watch is located at 500 North Main Street, Suite 110, Sebastopol, CA 95472, Telephone: 707-824-4372, Email:US@ncriverwatch.org.

Coast Action Group is an organization dedicated to the protection of fishery and water quality resources on the north coast of California. Coast Action Group has a history of actions supporting the protection of fish, forest, and water quality resources dating back to 1990. Coast Action Group exists in order to protect fish and wildlife through state and federal water laws. It comments on issues of statewide concern in order to protect in-stream flows and water quality. It is currently participating in meetings and on a task force attempting to deal with important issues which affect listed species of Coho and Steelhead. Coast Action Group is located at P.O. Box 215, Point Arena, CA 95468, Telephone 707-882-2484, Email: alevine@ mcn.org.

**CONTACT INFORMATION**

NOTICING PARTIES have retained legal counsel to represent them in this matter. All communications with respect to the issues raised in this Notice should be addressed to the following counsel:

> Jack Silver, Esquire
> Law Office of Jack Silver
> Kimberly Burr, Esquire
> Jerry Bernhaut, Esquire
> P.O. Box 5469
> Santa Rosa, CA 95402-5469
> Tel. 707-528-8175
> Fax. 707-528-8675
> Email: lhm28843@sbcglobal.net

**CONCLUSION**

The violations as set forth in this Notice affect the health and enjoyment of the members of NOTICING PARTIES who reside, work and recreate in the affected area. NOTICING PARTIES and their respective members use these watersheds for domestic water supply, agricultural water supply, recreation, sports, fishing, swimming, hiking, photography, nature walks, restoration activities, and the like. The health, property rights, use, and enjoyment of these areas by the members of NOTICING PARTIES are specifically impaired by the violations of the ESA as alleged herein.

At the close of the 60-day notice period NOTICING PARTIES intend to amend the currently pending litigation filed in the U.S. District Court, Northern District of California entitled *Coho Salmon, et al v. Clinton Folger dba Green Pastures Valley, LLC, et al* Case No. 3:10-CV-00741 JL to add Nick Brodrick and Green Pastures Valley, LLC as party defendants. During the 60-day notice period NOTICING PARTIES are willing to discuss effective remedies for the violations described in this Notice. However, if VIOLATORS wish to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated within the next 20 days so that they may be completed before the end of the 60-day notice period. NOTICING PARTIES do not intend to delay the amendment of the current litigation identified above if discussions are continuing when the notice period ends.

Very truly yours,

Jack Silver

Jack Silver

JS:lhm
Attachment - Exhibit A
cc:    Stephen M. Gallenson, Esq.
       Law Office of Andrian & Gallenson
       1100 Mendocino Avenue
       Santa Rosa, CA 95401